## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

**MS. MADDIE SINGER,**

    **Plaintiff,**

**v.**                                                     Case No.
                                                            **JURY DEMANDED**

**THE UNIVERSITY OF**
**TENNESSEE HEALTH**
**SCIENCES CENTER,**

    **Defendant.**

## COMPLAINT FOR DAMAGES

COMES NOW, Ms. Maddie Singer (hereinafter, "Ms. Singer" or "Plaintiff"), by and through undersigned counsel, and for her complaint against the University of Tennessee Health Sciences Center (hereinafter, "UTHSC" or "Defendant") and states as follows:

### NATURE OF THE COMPLAINT

1. This is a case for wrongful termination based on Defendant's discriminatory treatment of Ms. Singer based on Ms. Singer's sex, specifically her nonconformity with gender stereotypes, and based on her transgender identity.

2. UTHSC hired Ms. Singer in about 2010.

3. UTHSC hired Ms. Singer because UTHSC enjoyed a long and profitable relationship with Ms. Singer which dated back to 2002, during which time Ms. Singer operated a private anopsologist practice.

4. Upon UTHSC's hiring of Ms. Singer, Ms. Singer worked for UTHSC as an anaplastologist, a professional who creates facial prosthetics for patients who have been injured or disfigured in the course of medical treatments.

5. Ms. Singer's work creating prosthetics included work for St. Jude's juvenile cancer patients and military veterans at the Memphis Veterans' Administration.

6. From the time of UTHSC's hiring of Ms. Singer until 2013, Ms. Singer presented herself in conformity with the gender she was assigned at birth, male.

7. Ms. Singer began transitioning to female in or about 2013, and began presenting herself as female in her day-to-day life in or about June 2015.

8. In or about June 2017, Dr. Timothy Hottel stepped down from his position as Dean of the College of Dentistry.

9. UTHSC appointed Dr. John Covington as Interim Dean of the College of Dentistry shortly after Dr. Hottel stepped down.

10. UTHSC, through Dr. Covington as Interim Dean of the College of Dentistry, discriminated against Ms. Singer, based on her non-conformity with traditional gender roles and because of her transgender identity when it terminated Ms. Singer's employment on [insert date of termination].

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction pursuant to 28 U.S.C. §1331 because Plaintiff's claims arise under the laws of the United States, specifically, 42 U.S.C. § 2000.

2. The Western District of Tennessee, Western Division, has personal jurisdiction over Defendant because Defendant conducts business in this Judicial District.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1319(b) because a substantial part of the events giving rise to the claim occurred in this District and because Defendant can be found in this District.

4. Further, Plaintiff has exhausted her administrative remedies through the Equal Employment Opportunities Commission and was issued her Notice of Right to Sue on or about April 8, 2019.

## PARTIES

5. Plaintiff Maddie Singer is an adult resident of Memphis, Shelby County, Tennessee.

6. Defendant employed Plaintiff in as an anaplastologist in the College of Dentistry, from approximately 2010 until about June 30, 2018.

7. , UTHSC is a subdivision of the University of Tennessee.

8. The University of Tennessee is a land grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate educational programs at various campuses throughout Tennessee.

9. The University of Tennessee, and by extension UTHSC, is an instrumentality of the State of Tennessee, and is administered by the UT Board of Trustees.

10. Upon information and belief, Defendant UTHSC's principal place of business is located at 910 Madison Avenue, Memphis, Tennessee 38163.

11. Ms. Singer worked for UTHSC at its Memphis, Tennessee location.

12. Upon information and belief, and pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure, UTHSC may be served with process through the Attorney General of the State of Tennessee, Herbert H. Slatery III at 425 5th Avenue North #2, Nashville, Tennessee, 37243.

## FACTUAL BACKGROUND

13. UTHSC hired Ms. Singer in or about 2010, but Ms. Singer worked in association with the Dental College since 2002 while she was in private practice.

14. UTHSC offered Ms. Singer a full-time position as Director of Anaplastology in or about March 2015.

15. Anaplastology is the creation of prosthetics for individuals suffering from an absent, malformed, or disfigured portion of the anatomy, typically for the facial and cranial areas, and is a highly specialized field representing an intersection of art and medicine.

16. In the course of her employment with UTHSC, the University completely absorbed Ms. Singer's private anaplastology practice.

17. During her employment, UTHSC consistently evaluated Ms. Singer's performance as excellent, and most recently, UTHSC commemorated Ms. Singer's work with a plaque from her department honoring her commitment to excellence in the field of Anaplastology and her patients.

18. Ms. Singer held a very specialized position and is one of only two anaplastologists in the State of Tennessee.

19. Ms. Singer received a number of awards and notable accomplishments while employed with UTHSC.

20. Ms. Singer, who identifies as a transgender woman, transitioned from male to female during the period of 2013 to 2015.

21. Ms. Singer announced to UTHSC in June 2015 that she would present herself in her day to day life as a woman from that time forward.

22. Ms. Singer frequently wears makeup.

23. Ms. Singer wears feminine clothing.

24. Ms. Singer does not speak with a deep tone of voice.

25. As she occupied a non-tenure track position, Ms. Singer devoted the majority of her time to patient outreach and treating patients' problems with their maxillofacial prosthetics.

26. UTHSC acknowledged this in Ms. Singer's performance reviews for both 2016 and 2017, where Dr. Richard Cagna, Director of the Advanced Prosthodontics Program, stated that Ms. Singer consistently exceeded expectations in this area and built a robust practice through the school's prosthodontic clinic.

27. UTHSC substantially benefitted from Ms. Singer's specialized and dedicated skillset, as Ms. Singer billed over $250,000.00 over the course of 2016 and 2017 in her clinical role.

28. Furthermore, Ms. Singer invented three medical devices during her employment with UTHSC, for which she earned a patent pending and a substantial research grant.

29. Ms. Singer also had three scholarly publications and contracts for anaplastology consulting services with St. Jude, Memphis VAMC, and TriCare.

30. Ms. Singer was featured on both local and national news programs for her work and accomplishments.

31. UTHSC was so pleased with Ms. Singer's level of work, that it commissioned her to sculpt four bronze busts of current and historical figures important to the school, including Gov. Winfield C. Dunn, for whom the College of Dentistry was named.

32. UTHSC prominently featured both Ms. Singer's work products, such as the aforementioned bronze busts, and Ms. Singer herself in a video that played in the lobby of the College of Dentistry advertising the school's curriculum and achievements of its faculty.

33. Ms. Singer's problems with her employment with UTHSC arose after Dr. Tim Hottel, Dean of the College of Dentistry, left his post and was replaced by Interim Dean Dr. John Covington in or about June 2017.

34. At the time of his departure, Dr. Hottel warned Ms. Singer to "watch out for Covington."

35. When Ms. Singer pressed for more information, Dr. Hottel said that Dr. Covington "never liked you for what you are" in reference to her transgender identity.

36. Dr. Hottel stated that after Ms. Singer announced her transition, Dr. Covington would make faces of disgust whenever Ms. Singer's name was mentioned.

37. Dr. Covington's nonverbal communication demonstrated his discriminatory animus against Ms. Singer due to her transgender identity.

38. Dr. Covington also referred to anyone he did not respect as a "knucklehead" and referred to Ms. Singer as such on multiple occasions.

39. It was commonly known by UTHSC staff that Dr. Covington used the term "knucklehead" in a negative, derogatory manner.

40. Ms. Singer and Dr. Covington had limited interactions prior to his appointment as Interim Dean.

41. Ms. Singer and Dr. Covington had limited interactions prior to Ms. Singer announcing her transition.

42. Dr. Covington had no legitimate basis for expressing disgust or animus towards Ms. Singer.

43. Dr. Covington clearly demonstrated his discriminatory animus against Ms. Singer based on her transgender identity through his repeated expressions of disgust only after Ms. Singer announced her transition.

44. Dr. Covington's terse demeanor towards Ms. Singer in the few instances where they did interact served to reinforce Dr. Covington's dislike of Ms. Singer based on her transgender identity.

45. At or about the end of January 2018, Ms. Chandra Alston in the UTHSC Human Resources office called Ms. Singer.

46. Ms. Alston told Ms. Singer that Dr. Covington met with Dr. Kennard Brown, Vice Chancellor of UTHSC, to discuss terminating Ms. Singer for ordering CBCT scans without a medical license.

47. Ms. Alston informed Ms. Singer that in the conversation between Dr. Brown and Dr. Covington, Dr. Brown stated incredulously "You want to fire her for helping kids with cancer? Get the fuck out of here."

48. Ms. Singer immediately refuted this statement to Ms. Alston by replying that Dr. Jeffrey Brooks, Director of 3D Imaging, had issued orders by Ms. Singer's request, to enable her to create 3D printed renderings for Ms. Singer's St. Jude patients seeking maxillofacial prosthetics.

49. Ms. Singer has never ordered a CBCT scan without the oversight of a medically licensed professional.

50. Dr. Brown was aware of Dr. Covington's active animus against Ms. Singer based on her transgender identity, and strongly opposed Dr. Covington's discriminatory position.

51. On or about March 28, 2018, Ms. Singer was called into Dr. Cagna's office to meet with him and Dr. Russell Wicks, Chair of the Prosthodontics Department.

52. In this meeting, Dr. Cagna and Dr. Wicks told Ms. Singer her contract was not being renewed because she did not have a Master's degree, which was a requirement for faculty members according to the UTHSC employee handbook.

53. Ms. Singer immediately pointed out that UTHSC employed two cis-gender[1] female faculty members who did not have Master's degrees but were working toward obtaining one.

54. Ms. Singer proposed that she could also pursue a Master's degree in order to continue her appointment as the Director of Anaplastology.

55. However, when Ms. Singer offered this solution, Dr. Cagna changed course and claimed Ms. Singer's termination was related to her billing.

56. Dr. Wicks and Dr. Cagna suggested that Dr. Covington might be willing to let Ms. Singer remain in her position at a reduced salary, but she would lose her faculty position and her office.

57. Ms. Singer responded that Dr. Covington clearly knew she would not accept a demotion from her faculty position and a reduction in her salary.

58. Dr. Cagna and Dr. Wicks did not respond when Ms. Singer asked if her termination was truly based on her lack of a Master's degree or her billing, as the reason had shifted over the course of the conversation.

59. Ms. Singer reiterated that she was being singled out, that her performance reviews were excellent, and that she had done nothing wrong.

60. Dr. Wicks agreed, stating, "it has nothing to do with your work."

61. As for the alleged billing issues, Mr. Dan Brown, Assistant Dean for UTHSC's business and finance office, previously approached Ms. Singer in or about August 2017.

---

[1] The term "cis-gender" or "cis-gendered" refers to an individual whose gender identity conforms with the biological sex he or she is assigned at birth.

62. Mr. Brown claimed that there had been an issue billing under Ms. Singer's NPI number for durable medical equipment ("DME") claims because she did not hold a medical license, in spite of the fact that Ms. Singer has successfully billed claims for DME under her own NPI number while she practiced as an independent anaplastologist from 2002 to 2010.

63. To resolve Mr. Brown's concerns, Dr. Seeberg, former Dean of Clinical Affairs, offered to have UTHSC simply bill Ms. Singer's lucrative services under Dr. Cagna's NPI, with Dr. Cagna serving as Ms. Singer's supervising medically licensed professional.

64. Dr. Cagna agreed and UTHSC approved this method, which is nearly identical to the manner in which UTHSC bills for student clinical services.

65. Ms. Singer understood that this would resolve any problems associated with billing for her services.

66. Ms. Singer was not informed at any point after this solution was proposed, adopted, and implemented of any further problems with her billing, until her termination meeting with Dr. Cagna and Dr. Wicks.

67. Since the meeting where Dr. Cagna and Dr. Wicks informed Ms. Singer her contract was not being renewed, Ms. Singer was granted an indefinite adjunct faculty status to enable her to complete certain cases, as there is no other individual employed by UTHSC who is sufficiently qualified or knowledgeable to take over her case load.

68. UTHSC's decision to grant Ms. Singer adjunct faculty status to enable her complete her active cases, some of which she billed for DME under Dr. Cagna's NPI, demonstrates that UTHSC had no issue with Ms. Singer continuing the DME billing arrangement that had been in place and that UTHSC's problem with Ms. Singer was not related to any billing issue.

69. After Ms. Singer was informed her contract was not being renewed, Dr. Brown submitted several e-mails wherein he stated that her skillset was too valuable to the Memphis medical community, and that he would attempt to arrange for her to obtain a position with the Regional Medical Center, which is associated with UTHSC.

70. Unfortunately, the Regional Medical Center did not have the room or the equipment for Ms. Singer to continue offering anaplastology services.

71. Therefore, it is clear that Ms. Singer's future career prospects have been seriously harmed by UTHSC's discriminatory treatment based on her transgender identity.

## **COUNT I – SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – Discrimination on the Basis of Transgender Identity**

72. Plaintiff incorporates by reference paragraphs 1 through 71 as if set forth fully herein.

73. Ms. Singer is a member of a protected class.

74. Ms. Singer is a transgender female, and therefore a member of a protected class.

75. Ms. Singer suffered an adverse employment action.

76. Ms. Singer's contract for employment was non-renewed on or about March 26, 2018, and she separated from employment with UTHSC on or about June 15, 2018.

77. Ms. Singer was qualified for the position.

78. Ms. Singer worked with UTHSC for over fifteen years and consistently received positive performance reviews.

79. Ms. Singer was one of only two anaplastologists in the State of Tennessee, and regularly treated patients from across the southeastern region of the United States.

80. Ms. Singer suffered less-favorable treatment than similarly-situated employees outside her protected class.

81. Ms. Singer suffered different and less favorable treatment at UTHSC compared to her cis-gender female counterparts.

82. Initially, UTHSC claimed that it was non-renewing Ms. Singer's contract because Ms. Singer does not possess a Master's degree.

83. At least two cis-gender females, who also do not possess Master's degrees, are currently employed by UTHSC and have had their contracts renewed.

84. These cis-gendered females received preferential treatment from UTHSC, as their contracts were renewed, and Ms. Singer's was not.

85. Dr. Covington began repeatedly making faces of disgust when Ms. Singer's name was mentioned only after she announced her transition.

86. Dr. Covington does not make faces of disgust when cis-gendered females are mentioned in conversation.

87. UTHSC's actions against Ms. Singer constitute discrimination on the basis of her sex.

88. UTHSC's discrimination negatively impacted the terms and conditions of Ms. Singer's employment and compensation.

89. UTHSC discriminated against Ms. Singer by negatively impacting the terms and conditions of her employment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, when it elected not to renew Ms. Singer's contract for employment but renewed the contracts of cis-gender female employees, and permitted Dr. Covington to openly display his discriminatory animus by making faces of disgust whenever Ms. Singer's name was mentioned.

90. As a direct and proximate result of UTHSC's discriminatory actions, Ms. Singer was injured and suffered damages because of UTHSC's illegal non-renewal of her contract.

91. UTHSC's conduct caused Ms. Singer to suffer economic damages in the form of back-pay, front-pay, as well as compensatory damages in the form of humiliation, embarrassment, degradation, emotional distress, and mental anguish; punitive damages' as well as attorneys' fees, costs, and expenses.

**COUNT II – SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – Nonconformity with Gender Stereotypes**

92. Plaintiff incorporates by reference Paragraphs 1 through 91 as if fully set forth herein.
93. Ms. Singer was born Matthew Singer, and assigned male gender at birth.
94. Because Ms. Singer was assigned male gender at birth, she is a member of a protected category.
95. Ms. Singer announced she would be living her daily life as a female in or about June 2015, and that she had been transitioning to female since 2013.
96. Ms. Singer now lives her daily life as a woman.
97. Ms. Singer frequently wears makeup.
98. Ms. Singer wears feminine clothing.
99. Ms. Singer does not speak with a deep tone of voice.
100. Ms. Singer was employed by UTHSC at the time she announced her transition.
101. In presenting herself in her daily life as a female, Ms. Singer does not conform to male gender stereotypes.
102. Ms. Singer's nonconformity with male gender stereotypes is evident from the fact that she dresses femininely and wears makeup.
103. This is particularly evident, as during the period of time from Ms. Singer's date of hire until 2015, Ms. Singer presented herself in her daily life as a male by wearing

typically male clothing, wearing no makeup, and using male pronouns and a masculine name, Matthew.

104. Ms. Singer suffered an adverse employment action.

105. Ms. Singer's contract for employment was non-renewed on or about March 26, 2018, and she separated from employment with UTHSC on or about June 15, 2018.

106. Ms. Singer was qualified for the position.

107. Ms. Singer worked with UTHSC for over fifteen years and consistently received positive performance reviews.

108. Ms. Singer was prominently featured in UTHSC's promotional video discussing the College of Dentistry, its curriculum, and its faculty's accomplishments.

109. Ms. Singer was engaged to create bronze sculptures of prominent figures from UTHSC's history.

110. Ms. Singer received less preferential treatment in comparison to male employees who conform to male gender stereotypes.

111. Specifically, no male employees who conform to male gender stereotypes had their contracts non-renewed at or about the same time as Ms. Singer's contract was non-renewed.

112. UTHSC's actions against Ms. Singer constitute discrimination on the basis of her sex, specifically that she does not conform to male gender stereotypes.

113. UTHSC's discrimination negatively impacted the terms and conditions of Ms. Singer's employment and compensation.

114. UTHSC discriminated against Ms. Singer by negatively impacting the terms and conditions of her employment on the basis of her sex, in violation of Title VII of the Civil

Rights Act of 1964, as amended, when it elected not to renew Ms. Singer's contract for employment but renewed the contracts of male employees who do conform to male gender stereotypes

115. As a direct and proximate result of UTHSC's discriminatory actions, Ms. Singer was injured and suffered damages because of UTHSC's illegal non-renewal of her contract.

116. UTHSC's conduct caused Ms. Singer to suffer economic damages in the form of back-pay, front-pay, as well as compensatory damages in the form of humiliation, embarrassment, degradation, emotional distress, and mental anguish; punitive damages' as well as attorneys' fees, costs, and expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1. A declaratory judgment that the practices complained of herein are unlawful under Title VII of the Civil Rights Act of 1964;
2. Pre-judgment and post-judgment interest, as provided by law;
3. Equitable relief in the form of reinstatement;
4. An award of money damages in the form of front pay, back pay, fringe benefits, and compensatory damages, and penalties in an exact amount to be determined at trial;
5. An award of punitive damages;
6. Costs and expenses of this action incurred herein, including reasonable attorneys' fees and expert fees;
7. That this matter be tried by a jury;

8. Any and all such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Dated: July 8, 2019

Respectfully Submitted,

  s/ Laura Ann E. Bailey
Alan G. Crone, TN Bar No. 014285
Laura Ann E. Bailey, TN Bar No. 027078
Bailey H. Dorsey, TN Bar No. 033664
The Crone Law Firm, PLC
88 Union Avenue, 14th Floor
Memphis, TN 38103
Telephone: 901-737-7740
Facsimile: 901-474-7926
acrone@cronelawfirmplc.com
lbailey@cronelawfirmplc.com
bdorsey@cronelawfirmplc.com
*Attorneys for Plaintiff*

## DECLARATION AND VERIFICATION

I, Maddie Singer, verify and declare that the facts stated in the foregoing Verified Complaint for Damages to the best of my knowledge and belief are true, sand that the Complaint is not made out of levity or by collusion with the Defendant, but in sincerity and truth for the causes mentioned in the Complaint.

_____
Maddie Singer

Date: 07 / 07 / 2019

Doc ID: 0c0b3618dfd96a5d5155c42790ed0a4979a016eb